## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

JOE BRUNEAU, DAVID
PHILLIPS, DANA RALKO,
PATTY RALKO, MARY
RANDALL, OSRO RANDALL,
JAMES MRDUTT, ALICIA
MRDUTT, individually and on
behalf of all those similarly situated,

      Plaintiffs,                          No. 20-cv-11588

      v.                                 JURY TRIAL DEMANDED

THE MICHIGAN DEPARTMENT
OF ENVIRONMENT, GREAT
LAKES & ENERGY; THE
MICHIGAN DEPARTMENT OF
NATURAL RESOURCES; FOUR
LAKES TASK FORCE; COUNTY
OF MIDLAND; COUNTY OF
GLADWIN; and JOHN DOES 1-
100,

      Defendants.

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Joe Bruneau, David Phillips, Dana Ralko, Patty Ralko, Mary

Randall, Osro Randall, James Mrdutt, and Alicia Mrdutt ("Plaintiffs"), by and

through their attorneys, state as follows for their Class Action Complaint against the

Michigan Department Of Environment, Great Lakes & Energy, and the Michigan

Department Of Natural Resources (collectively, the "State Defendants"); Four Lakes

Task Force ("FLTF") and its constituent members County of Midland and County of Gladwin (collectively, the "County Defendants"); and John Does 1-100:

## I.    SUMMARY OF THE CASE

1.    Plaintiffs and the Class live or own property near four major dams on the Tittabawassee River in the State of Michigan. They reasonably believed that the state and county entities responsible for maintaining the dams and water levels regulated by those dams, including the State Defendants and County Defendants, would comply with the applicable laws and regulations, and the requisite standards of care, and fulfill their duties to keep the property of Plaintiffs and the Class safe from catastrophic flooding caused by the failure of one or more dams.

2.    However, by 2019, all Defendants either knew or should have known that Edenville and Secord dams had inadequate auxiliary spillway capacity, creating an unacceptable risk of flooding to adjacent properties.  Defendants also knew or should have known that the Federal Energy Regulatory Commission ("FERC") had repeatedly cited the unsafe condition of the Edenville Dam, and had gone so far as to revoke the Owner/Operator Defendants' license to operate that dam, because it only had  approximately 50% of the federally mandated Probable Maximum Flood ("PMF") standard..

3.    The State Defendants became the regulating authority over the Edenville Dam after its license was revoked by FERC on September 10, 2018.

The State Defendants knew of the high risks caused by the poor condition and inadequate spillways at the Edenville Dam and the Secord Dam, and were aware of FERC's public findings, its communications with the dam's owners regarding these findings, and the revocation of the Edenville Dam's license by FERC. Yet the State Defendants intentionally failed to protect the Plaintiffs and the Class from the known dangers of catastrophic flooding caused by the inadequate spillway, and in fact took direct action to force the owners to *raise* the water levels, directly leading to the catastrophic flooding that began on May 19, 2020.

4.      The County Defendants knew of the risk of flooding, and also knew that FERC had revoked the license for the Edenville Dam in September 2018 due to inadequate spillway capacity. Yet the County Defendants did nothing to protect the Plaintiffs and the Class from the known dangers of catastrophic flooding caused by the inadequate spillway, and in fact prioritized less important repairs, leaving the adjacent residents at increased risk of flooding.

5.      After several days of rain in May 2020, floodwaters overwhelmed the Secord Dam due to its inadequate spillway capacity. The Edenville Dam then collapsed on the evening of May 19, 2020, releasing floodwaters which breached the Sanford Dam located further downstream. The failures of these dams have caused severe flooding in the Midland, Michigan area, the draining of Wixom Lake, and severe damages to the property of Plaintiffs and the Class.

6.      Plaintiffs and the Class sustained property damage and economic damage as a result of Defendants' conduct, as described in more detail below. Plaintiffs bring this action against the Defendants, individually and on behalf of the Class, for compensatory and punitive damages, and such other relief as allowed by law.

## II.     PARTIES

7.      Plaintiff Joe Bruneau is an information technology specialist who works and lives at a residence he owns on Kilt Court, Midland, Michigan 48640. Floodwaters from the breach of the Edenville Dam destroyed his entire finished basement, all his office equipment, blew out his basement windows, and destroyed approximately 65 years of family photographs and heirlooms along with a pool table, furnace, water heater, and electrical box.   Mr. Bruneau's garage flooded, ruining a refrigerator, tools, and air conditioning unit.   Mr. Bruneau's outdoor hot tub was also destroyed by floodwaters.   Mr. Bruneau is in the process of paying to demolish the areas of his property ruined by flooding, after which he will need to pay for mold remediation, rebuilding, and new utilities/furniture.   On information and belief, his real property is worth substantially less than it was prior to the flooding.

8.      Plaintiff David Phillips owns two vacation homes that were damaged by flooding following the collapse of the Edenville Dam, located on Oakridge Drive, Beaverton, Michigan 48612.   One property is located on Wixom Lake, and one is

located on an adjoining canal.  Both homes suffered 30 to 36 inches of flooding, which destroyed the main floor of each house because neither house has a basement. Mr. Phillips is in the process of paying to demolish the areas of his property ruined by flooding, after which he will need to pay for mold remediation, rebuilding, and new utilities/furniture.  On information and belief, his real property is worth substantially less than it was prior to the flooding.

9.      Plaintiffs Dana Ralko and Patty Ralko are a retired couple who own a residence on North Gil Haven Court, Sanford, Michigan 48657.  As a result of the failure of the Edenville Dam, the Ralko residence was flooded with damage to their basement carpet and drywall, a 50-foot walkway and deck, brick patio, landscaping, and their furnace and air conditioning unit.  The Ralkos are in the process of paying to demolish the areas of their home ruined by flooding, after which they will need to pay for mold remediation, rebuilding, and new utilities/furniture. On information and belief, their real property is worth substantially less than it was prior to the flooding.

10.     Mary Randall and Osro Randall are a retired couple who own a residence on Lessa Street, Midland, Michigan 48640.  As a result of flooding caused by the failure of the Edenville Dam, the basement of the Randall residence was flooded with sewage when the City of Midland's sewer pumps failed after being

compromised by floodwaters.  The Randalls are in the process of paying to demolish the areas of their home ruined by flooding and sewer back-up, after which they will need to pay for environmental remediation, rebuilding, and new utilities/furniture. On information and belief, their real property is worth substantially less than it was prior to the flooding.

11.    Plaintiffs James and Alicia Mrdutt own a residence on Nurmi Drive, Midland, Michigan 48640, approximately one mile from the river at Sturgeon Creek. As a result of flooding caused by the failure of the Edenville Dam, the Mrdutt residence was severely damaged by flooding and sewage back-up, including destruction of their finished basement and a collection of over 3,000 DVDs.  The Mrdutts are in the process of paying to demolish the areas of their home ruined by flooding and sewer back-up, after which they will need to pay for environmental remediation, rebuilding, and new utilities/furniture. On information and belief, their real property is worth substantially less than it was prior to the flooding.

12.    Defendant Michigan Department of Environment, Great Lakes and Energy ("EGLE"), known as the Michigan Department of Environmental Quality ("MDEQ") prior to an April 22, 2019 reorganization, is the state agency that is charged with protecting Michigan's environment and public health inter alia by managing water resources.

13.    The Water Resource Division ("WR") of EGLE ("EGLE-WR") is

charged with ensuring Michigan's water resources remain clean and abundant inter alia by monitoring water quality, and the health of aquatic communities, developing policy, and protecting, restoring and conserving Michigan's inland lakes, streams and wetlands.

14.     The Dam Safety Unit of EGLE-WR ("EGLE-WR-DS") is responsible for ensuring the safety of Michigan's state-regulated dams. The EGLE-WR-DS program focuses on ensuring that dams are properly constructed, inspected, and maintained, and that the owners have adequately prepared for potential emergencies.

15.     On information and belief, the EGLE-WR-DS program has only two full-time staff members, plus one staff supervisor-hydrologist, dedicated to overseeing the regulation and safety of 1,061 dams within the State of Michigan, 89 of which bear a "high" hazard potential rating (as of 2018), and two-thirds of which have reached their typical 50-year design life, with a program budget of approximately only $400,000.

16.     The County of Midland is a county existing under the laws of the State of Michigan.

17.     The County of Gladwin is a county existing under the laws of the State of Michigan.

18.     FLTF is a designated authority created by resolutions of the County of Midland and the County of Gladwin pursuant to Part 307 of the Natural Resources

and Environmental Protection Act, 1994 PA 451.

## III.   JURISDICTION

19.     The Court has subject-matter jurisdiction of this matter because Plaintiffs allege claims under 42 U.S.C. § 1983 against the State Defendants and the County Defendants, and has supplemental jurisdiction of Plaintiffs' remaining claims under 28 U.S.C. § 1367.

20.     The Court has personal jurisdiction over the State Defendants for committing torts within and that the affected property in the State of Michigan.

21.     The Court has personal jurisdiction over the County Defendants for committing torts within and that affected property in the State of Michigan.

22.     Venue is proper in this Court because the original injury and damage occurred in the Eastern District of Michigan, the Defendants reside or conduct business in the Eastern District of Michigan, and Plaintiffs reside in the Eastern District of Michigan.

## IV.   FACTS

### A.  Spillway Capacity and PMF Requirements

23.     Dams are retaining structures or structures that are built to create large standing bodies of water known as reservoirs. A spillway is a structure constructed in a dam to provide a safe path for floodwaters to escape to some downstream area.

24.     Every reservoir has a certain capacity or amount of water it can hold.

If the reservoir is already full but floodwaters enter the reservoir, the water level will increase, and this could result in the over-topping of the dam.

25.     Spillways are built to prevent this, as it allows some water to be drawn from the top of the reservoir to make room for the new water.

26.     When a reservoir is full, its water level will be equal to the height of the spillway. As soon as any excess water enters the reservoir, water will immediately start flowing out through the spillway.

### B. The Secord, Edenville, and Sanford Dams

27.     On the Tittabawassee River in Michigan, there are four reservoirs, each with a dam.

28.     In existence since the 1920s, the four projects' reservoirs occupy about 39 river miles on the Tittabawassee River, with the tailwater of each project being the headwater of the next downstream project.

29.     Beginning furthest downstream, the projects are the 3.3-megawatt (MW) Sanford Hydroelectric Project No. 2785 ("the Sanford dam"), the 4.8-MW Edenville Project No. 10808 ("the Edenville dam"), the 1.2-MW Smallwood Project No. 10810, and the 1.2-MW Secord Project No. 10809 ("Secord Dam").

30.     Historically, the dam operator has drawn down the reservoirs from three to four feet in the late winter to minimize spilling during spring snowmelt run-off.

31.      The Edenville dam spans both the Tittabawassee and Tobacco Rivers creating a 2,600-acre reservoir known as Wixom Lake, with a gross storage capacity of about 40,000 acre-feet and a 49-mile-long shoreline at full pool.

32.      Due to its inadequate spillways, flooding at Edenville can occur in the spring as the result of heavy spring rains or snow cover melting. Major floods occurred on June 24, 2017, September 13, 1986, March 21, 1948, March 8, 1946, and June 3, 1943.

33.      A picture of the Edenville dam in working condition follows:



34.      The Sanford Dam, the most downstream project, has a Michigan Department of Environmental Quality (MDEQ) high hazard rating due to the size of the dam and the development on and below the dam.

35.      A picture of the Sanford Dam in working condition follows:



36.    The location of the Edenville and Sanford dams is shown on the

following map:



**C. Structural deterioration and insufficient spillway capacity at the Edenville Dam has been well-documented for years.**

37.    The four dams and hydroelectric projects at Sanford, Edenville,

Smallwood and Secord are all owned by entities related to Lee Mueller and Boyce

Hydro Power (the "Owners").

38.     Since at least 1993, the Owners and their predecessors in interest have been repeatedly cited by regulators for structural deterioration and inadequate spillway capacity at the Edenville Dam.

39.     Since at least 1999, FERC notified the Owners that they needed to increase capacity of the Edenville Dam's spillways to prevent a significant flood from overcoming the structure.

40.     As detailed in multiple orders, throughout their ownership of the project, the Owners repeatedly failed to comply with their license for the Edenville Project, the FERC regulations, and FERC orders, or to otherwise fix or maintain the Edenville Dam as required by the standard of care.

41.     By June 2017, FERC issued a Compliance Order, after citing the Owners for violations of its license and FERC's regulations for years, for violations which included "failing to increase the spillway capacity of the project."

42.     In the Compliance Order, FERC made clear that its "primary concern is the licensee's longstanding failure to address the project's inadequate spillway capacity. The Edenville dam has a high hazard potential rating, which means a failure of the project's works would create a threat to human life and/or would cause significant property damage. The project's spillway deficiencies must be remedied."

43.     FERC emphasized that the Owners' failures caused a "grave" risk

for the "potential loss of life and destruction of property and infrastructure."

44.    In the Compliance Order, FERC found: "Thirteen years after acquiring the license for the project, the licensee has still not increased spillway capacity leaving the project in danger of a PMF event. The licensee has shown a pattern of delay and indifference to the potential consequences of this situation. A situation that must be remedied in order to protect life, limb, and property." FERC also noted the Owners' "longstanding failure to address the project's inadequate spillway capacity at this high hazard dam."

**D. FERC orders the Owners to cease operations at the Edenville Project.**

45.    As before, FERC noted that its "primary concern is the licensee's failure to address the project's inadequate spillway capacity."

46.    FERC thus ordered: "Boyce Hydro Power, LLC (licensee) must cease generation at the Edenville Hydroelectric Project by November 27, 2017. Generation must not resume until further order by [FERC]."

47.    FERC noted that the Owners admitted that it diverted revenues that could have been used to ameliorate dam safety risks at the Edenville Project to support other projects, which further undermined any contention that the Owners have diligently attempted to address issues at the Edenville Project.

**E. FERC revokes the Owners' license to operate
the Edenville Project on September 10, 2018.**

48.    On September 10, 2018, FERC issued an order revoking Boyce's

license for the project. According to FERC: "Of particular concern has been the project's inability to pass the Probable Maximum Flood (PMF) due to inadequate spillway capacity."

49.     On February 15, 2018, FERC entered an order recommending Boyce's license be revoked. FERC stated: "[Our] primary concern has been the licensee's longstanding failure to address the project's inadequate spillway capacity, which currently is designed to pass only approximately 50 percent of the PMF. Failure of the Edenville dam could result in the loss of human life and the destruction of property and infrastructure."

### F. The State Defendants Intentionally Ignore Flood Risks At The Edenville Dam In Order To Focus On Environmental Enforcement.

50.     Although the Owners' license to operate the dam was revoked on September 10, 2018, they continued to own the Edenville Dam and remained liable for its condition.

51.     FERC's order revoking its license for the Edenville Dam had the effect of transferring regulation and upkeep of the dam to the State Defendants.

52.     However, during the relevant period, the State Defendants intentionally avoided taking any action to address the deterioration of the Edenville Dam and insufficient spillway capacity of the Edenville Dam and Secord Dam.

53.     While under FERC licensure, the Edenville Dam had long been considered potentially unsafe to downstream communities because its inadequate

spillway capacity rendered it barely able to satisfy one-half of the FERC 100% PMF standard.

54.    Contrary to extensive findings by FERC that the spillways at the Edenville Dam were not sufficient to withstand the PMF, the State Defendants declared the dam and its spillways were in "fair structural condition."

55.    An authority called the Four Lakes Task Force ("FLTF") was then created by resolutions passed in Midland and Gladwin Counties to administer and oversee the maintenance and operations of the four dams and reservoir.

56.    The FLTF dam safety engineers issued a memorandum on September 18, 2019 which stated that

> "At this point in time, based on the documents reviewed, the FLTF does not believe that the Edenville Dam can be operated to meet the EGLE dam safety requirement to pass the ½ PMF without certain repairs and improvements."

57.    Moreover, FLTF's dam safety engineers determined that the Edenville Dam would fail to meet even the State of Michigan's 50% PMF standard because of its historically inadequate spillway capacity, its age, and the poor condition of its critically important gates and hoisting equipment.

58.    The State Defendants intentionally chose to ignore the critical risks posed by the dam – evidencing that the safety of Plaintiffs and the Class was not a priority.  Instead, the State Defendants *actively opposed* interim measures previously approved by FERC to reduce the risk of flooding, including drawdowns of the

Wixom reservoir, because of concern for freshwater mussels and fish.

59.    On November 20, 2019 EGLE wrote to MDNR expressing concern over proposed drawdowns of the Wixom reservoir to avoid or reduce the risks of flooding, stating that "[a] drawdown after the cold-season commences can expose […] hibernating animals to very cold dry air, where they can desiccate irreversibly."

60.    In January 2020, the State Defendants threatened to sue the Owners for drawing down Lake Wixom without permits, even though the drawdown would reduce the risk of flooding.

61.    Due to the State Defendants' threats of litigation against the Owners arising from the November 2019 drawdown, some of the Owner entities brought a lawsuit against some of the State Defendants in federal court in April 2020.  In their complaint, *the Owners admitted that the Edenville Dam was a known flood risk and that FERC had revoked its license due to inadequate spillways*, but contended that the State Defendants ignored these concerns and instead targeted the Owners for an environmental enforcement action to prevent the Owners  from drawing down Wixom Lake to reduce the risk of flooding.

62.    The State Defendants prioritized the welfare of freshwater mussels and fish in pursuing an environmental lawsuit against the Owners for the Wixom Lake drawdowns, yet disregarded the flood risks to Plaintiffs and the Class associated with substandard spillway capacity.

63.     As a result of threats by the State Defendants, and particularly their filing of an enforcement lawsuit against the Owners on May 1, 2020, the Owners followed the direction of State Defendants and allowed the water level in Wixom Lake to return to its normal level by May 2020.  In short, although the Owners had for decades negligently allowed unsafe conditions to persist at the Edenville Dam, the State Defendants ordered the Owners to aggravate the risk of a catastrophic flood by forcing water levels in Wixom Lake to be raised by early May 2020.

### F.   The County Defendants Prioritize Other Repairs To The Edenville Dam, But Do Not Address The Dam's Insufficient Spillway Capacity.

64.     Defendants Midland County and Gladwin County created Defendant FLTF as their Designated Authority under Part 307 of the Natural and Environmental Protection Act, for purposes which included repairing, maintaining, and operating the four dams including the Edenville Dam.

65.     The County Defendants knew or should have known that the March-September period poses the highest flood risk for the area within the FLTF's jurisdiction.

66.     In FLTF's April 2019 annual report, the County Defendants noted: "FERC revoked the license from Boyce Hydro in September of 2018 due to being non-compliant with the probable maximum flood (PMF) spillway capacity requirements."

67.    Despite this knowledge, the County Defendants ignored the risk of spring floods and instead focused their repairs and planning on providing for safe winter operations for the 2020-2021 winter: "The highest priority goal is the Edenville Dam's safe operations for the upcoming winter of 2020/2021."    The highest priority goal should have been addressing the unsafe inadequate spillway capacity, but the only reference to spillway capacity was the fifth point on the list, limited to "[d]etermin[ing] the auxiliary spillway type, capacity, location and schedule."

68.    Essentially, FLTF ignored its own findings provided to the State Defendants that the Edenville Dam could not meet ½ PMF spillway requirements, which FLTF knew or should have known posed an immediate, severe risk of dam failure and catastrophic flooding.

69.    FLTF conducted $300,000 of repairs to the Edenville Dam by March 2020.  However, on information and belief, FLTF took no action to increase the Edenville Dam's spillway capacity.

70.    FLTF's only "key/critical immediate items for 2020" for the Secord Dam related to spillway involved an extension of FERC's schedule for auxiliary spillway capacity and completing spillway analyses – despite the fact that FLTF already knew the Secord Dam had insufficient spillway capacity.

G.   **During the storms of May 2020, the Edenville Dam and Sanford Dam were breached, causing emergency evacuations and catastrophic damage.**

71.    As a result of heavy rains, on Monday, May 18, 2020, high flows were passing through Secord and Smallwood Dams on the Tittabawassee River.

72.    The National Weather Service and Gladwin County issued imminent hazard flash flood warnings.

73.    In fact, due to inadequate spillways at the Secord Dam, flooding did occur that caused substantial damage to Plaintiffs and the Class.

74.    As of 6 a.m. on May 19, 2020, the city of Midland had experienced 4.70 inches of rain in several days of storms. The flooding that overwhelmed the Secord upstream combined with the inadequate condition of the Edenville Dam then caused a series of events that caused further damage.

75.    At approximately 5:45 p.m. on May 20, 2020, water overtopped the Edenville dam. Then, the crest of the embankments of the dam began to crumble, creating a large bulge and deformation:



76.    The embankment then rapidly collapsed in a landslide:



77.    The full breach of the Edenville Dam followed within seconds:



78.     Water quickly flooded the surrounding areas:



79.     The power of water flowing from the Edenville Dam completely washed away a road bridge roughly a mile downriver and virtually emptied Wixom Lake, a 2,600-acre reservoir created by the dam, by the next morning.

80.     One hour later, at approximately 6:50 p.m. on May 20, 2020, the power of the water also caused a breach at Sanford Dam due to inadequate spillways and the collapse of the Edenville Dam.

81.     The following map illustrates the scope of damage projected to occur as a result of dam failures along the Tittabawassee River. The city of Midland urged residents within the shaded areas to evacuate.



82.     According to the Midland County Hazard Mitigation Plan (MCHMP), dam failure is "the collapse or failure of an impoundment resulting in downstream flooding." It states that "[d]am failures can result in loss of life and extensive

property or natural resource damage for miles downstream from the dam. Failure of a dam does not only occur during flood events, which may cause overtopping of a dam. Failure can also result from poor operation, lack of maintenance and repair, and vandalism. Such failures can be catastrophic because they occur unexpectedly, with no time for evacuation."

83.     The flooding forced about 11,000 people to evacuate their homes in the Midland area, following what the National Weather Service called "catastrophic dam failures" at the Edenville Dam and the Sanford Dam.

84.     Homes were submerged throughout the affected area, including in the City of Midland, where the water was so high that roofs of houses were barely visible in some parts.

85.     The floodwaters also mixed with containment ponds at a Dow Chemical Co. plant and could displace sediment from a downstream Superfund site.

86.     The floodwaters caused sewer pump stations in Midland to fail, flooding residents' basements and/or first floors with raw sewage.

87.     Thousands of people and entities have suffered significant property damage, and other damages, for which Defendants should be held responsible.

## V.     CLASS ALLEGATIONS

88.     Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(2), (b)(3) and (c)(4) on behalf of a proposed Class defined as follows: all individuals

and entities who suffered property damage from flooding resulting from the collapse of the Edenville Dam in Michigan in May 2020.

89. The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained and to obtain class wide equitable injunctive relief.

90. There are questions of law and fact raised by the named Plaintiffs' claims common to those raised by the Class(es) they seek to represent. Such common questions predominate over questions affecting only individual members of the Class(es).

91. The violations of law and resulting harms alleged by the named Plaintiffs are typical of the legal violations and harms suffered by all Class members.

92. Plaintiff Class representatives will fairly and adequately protect the interests of the Plaintiff Class members. Plaintiffs' counsel are unaware of any conflicts of interest between the Class representatives and absent Class members with respect to the matters at issue in this litigation; the Class representatives will vigorously prosecute the suit on behalf of the Class; and the Class representatives are represented by experienced counsel. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving personal and property damage.

93. Plaintiffs' attorneys have identified and thoroughly investigated all

claims in this action and have committed sufficient resources to represent the Class.

94.    The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants.

95.    Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating declaratory and injunctive relief for the Class.

## VI.    CAUSES OF ACTION

### COUNT I
### INVERSE CONDEMNATION UNDER 42 U.S.C. § 1983
### (AGAINST THE STATE DEFENDANTS AND COUNTY DEFENDANTS)

96.    Plaintiffs incorporate the preceding allegations by reference.

97.    The State Defendants intentionally disregarded information regarding the safety of the Edenville Dam's and Secord Dam's spillway capacity made available to it by FLTF, FERC, and information that was or should have been obtained by the State Defendants' dam safety personnel.

98.    The State Defendants intentionally threatened the Owners with a major environmental lawsuit, and later filed that lawsuit, to force the Owners to raise the water levels of Wixom Lake, which increased the risks of catastrophic flooding.

99.    The State Defendants intentionally dissuaded the Owners from

focusing on increasing spillway capacity at the Edenville Dam, and instead directed the Owners to raise water levels, increasing the risk of catastrophic flooding.

100.    The County Defendants had actual knowledge that FERC had revoked the Owners' dam license because the Edenville Dam did not meet minimum PMF requirements.

101.    The County Defendants had actual knowledge that the Secord Dam had inadequate spillway capacity.

102.    The County Defendants had actual knowledge that major floods in the area under their jurisdiction generally occur between March and September, and that FERC had revoked the license for the Edenville Dam for lack of adequate spillway capacity.

103.    The County Defendants intentionally prioritized maintenance and repairs unrelated to the inadequate spillway capacity, and performed some of these repairs in March 2020, while leaving repairs and upgrades to the Edenville Dam's and Secord Dam's spillway capacity for a future date.

104.    The actions of the State Defendants and County Defendants described above substantially contributed to and caused the catastrophic flooding in May 2020, which caused a significant decline in value of the Plaintiffs' property and damage to Plaintiffs' property.

105.    The State Defendants and County Defendants have not compensated

Plaintiffs for the decline of value to their property or the damage to their property.

**COUNT II**
**GROSS NEGLIGENCE**
**(AGAINST THE STATE DEFENDANTS AND COUNTY DEFENDANTS)**

106.  Plaintiffs incorporate the preceding allegations by reference.

107.  When FERC revoked the Owners' license for the Edenville Dam, the State Defendants assumed a duty to Plaintiffs and the Class to maintain the dam in a safe condition pursuant to Part 307 and Part 315 of the Natural Resources and Environmental Protection Act, codified at MCL 324.31506, *et seq.*

108.  The County Defendants assumed a duty to Plaintiffs and the Class to maintain the dam in a safe condition by establishing FLTF with the stated purpose of "ensur[ing] a sustainable future for Sanford, Wixom, Smallwood and Secord Lakes and the respective dams, for the benefit of lake property owners, local businesses, recreational lake users and the economies of Midland and Gladwin Counties."

109.  The State Defendants breached their duty to Plaintiffs and the Class by intentionally disregarding catastrophic flood risks arising from the Edenville Dam's and Secord Dam's inadequate spillway capacities, and instead focusing on environmental enforcement activity that actually ***increased*** the risk of catastrophic flooding.

110.  The County Defendants breached their duty to Plaintiffs and the Class

27

by making other studies, repairs and upgrades their highest priority in early 2020, despite actual knowledge that FERC had recently revoked its license for the Edenville Dam due to inadequate spillway capacity, that the Secord Dam also had inadequate spillway capacity, and despite actual knowledge that the March-September period is peak flood season in the area under the County Defendants' jurisdiction.

111.   The actions of the State Defendants and County Defendants described above were so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to Plaintiffs and the Class.

112.   The catastrophic flooding resulting from the failure of the Edenville Dam, arising from the grossly negligent conduct of the State Defendants and County Defendants, has caused Plaintiffs to suffer extensive damages, past, present, and future, including, but not limited to:

    a.    Extensive property damage and/or destruction;

    b.    Loss of business revenue;

    c.    Loss of income from property rentals;

    d.    Significant costs of remediation and rebuilding.

## COUNT III
## VIOLATION OF MICHIGAN CONSTITUTION ARTICLE 10 § 2
## (AGAINST THE STATE DEFENDANTS AND COUNTY DEFENDANTS)

113.   Plaintiffs incorporate the preceding allegations by reference.

114.    Article 10 § 2 of the Michigan Constitution states that "[p]rivate property shall not be taken for public use without just compensation."

115.    Any State injury to property that deprives the owner of ordinary use, including partial destruction or diminution in value of the property, is equivalent to a taking, and entitles the owner to compensation.

116.    As described above, the intentional courses of conduct of the State Defendants and County Defendants, severely diminished the value of the property of Plaintiffs and the Class, and deprived Plaintiffs and the Class of the ordinary use of their property.

117.    The State Defendants and County Defendants are liable to Plaintiffs and the Class for all diminution in value of their property resulting from the catastrophic flooding following the failure of the Edenville Dam.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant their request to proceed as a class action; appoint Plaintiffs as the Class Representatives and their counsel as Class Counsel; enter judgment against the Defendants on the claims asserted herein; award compensatory, punitive, and statutory damages and any other damages allowed by law; and grant such other and further relief as this Court deems appropriate.

Dated: June 16, 2020                    MCALPINE P.C.

                                        By: */s/ Mark L. McAlpine*
                                        Mark L. McAlpine
                                        Jayson E. Blake
                                        McAlpine PC
                                        3201 University Drive, Ste. 200
                                        Auburn Hills, MI 48326
                                        (248) 370-3700

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: June 16, 2020

By: */s/ Mark L. McAlpine*
Mark L. McAlpine
Jayson E. Blake
McAlpine PC
3201 University Drive, Ste. 200
Auburn Hills, MI 48326
(248) 370-3700

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 16, 2020 I filed a Complaint via CM/ECF.

Dated: June 16, 2020

Respectfully submitted,
**MCALPINE PC**

**<u>/s/ Alicia McNally</u>**
Alicia McNally
Legal Assistant
3201 University Dr., Suite 200
Auburn Hills, MI 48326