UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOE BRUNEAU,
DAVID PHILLIPS,
DANA RALKO,
N/A PATTY RALKO, N/A,         Case No. 1:20-cv-11588
MARY RANDALL,
OSRO RANDALL,                 District Judge Thomas L. Ludington
JAMES MRDUTT,                 Magistrate Judge Patricia T. Morris
ALICIA MRDUTT,

      *Plaintiffs,*

v.

MIDLAND, COUNTY OF,
GLADWIN, COUNTY OF,
and JOHN DOES 1-100,

      *Defendants.*

_____/

**REPORT AND RECOMMENDATION ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (ECF No. 56)**

I. **RECOMMENDATION**

For the following reasons, **I RECOMMEND** that this Court **GRANT** Defendants' motion for summary judgment (ECF No. 56) and dismiss the amended complaint (ECF No. 32).

II. **REPORT**

   A. **Introduction**

The Fifth Amendment's Takings Clause prohibits the government from taking private property for public use without "just compensation." A "taking," to be sure,

1

occurs not just when the Government confiscates private property outright, but also when it interferes with the use of private property to a substantial degree. Yet in either case, the Takings Clause contemplates a specific type of injury: situations where the government takes property from X for the use of Y. Put another way, it does not proscribe all destruction of private property, but only destruction that is intended to convey some benefit to the public.

But this is not such a case. The Plaintiffs here are a group of landowners who argue that Midland and Gladwin Counties "took" their properties by causing a dam failure that flooded their lands. Their theory is that the Counties negligently set the reservoir behind the dam at too high of a level, eventually leading to the dam's collapse following a heavy storm. But absent from the record is any indication that the Counties intended to cause the flooding, let alone for the benefit of the public.

Whatever may be said of the Counties' actions, they are not the sort of conduct encompassed by the Takings Clause. Accordingly, I recommend that the Court grant the Counties' motion for summary judgment.

### B. Background

The Edenville dam sits on Michigan's Tittabawassee river. (ECF No. 56-10, PageID.2565). Part of a string of four dams located in Midland and Gladwin Counties, the dam sits upstream of the Sanford dam and downstream of the Secord and Smallwood dams. (*Id.*) The Edenville dam connects to a fifty-foot long intake

which directs water to hydroelectric power plant. (ECF No. 59-7, PageID.3636). In 2004, Boyce Hydro Power, LLC, received a license to operate the dam and collect revenue from its power plant. (ECF No. 12-3, PageID.158). Before Boyce acquired its license, the Federal Energy Regulatory Commission ("FERC") had warned Boyce's predecessor that the dam's "spillways"—channels that carry excess stream flows past a dam—had an inadequate capacity. (ECF No. 59-7, PageID.3637). *See generally Spillway*, Encyclopedia Britannica, https://www.britannica.com/technology/spillway-engineering (last updated Aug. 18, 2021). And for the next thirteen years, FERC attempted to work with Boyce to correct the dam's inadequate spillway capacity. (ECF No. 59-7, PageID.3637–41). But these efforts led nowhere, and in 2017, by which point Boyce had also acquired title to the dam in addition to its license to operate the power plant, FERC warned Boyce that it would revoke Boyce's license to operate the dam and collect revenue unless Boyce corrected the dam's inadequate spillway capacity. (ECF No. 12-3, PageID.203–04; ECF No. 56-3, PageID.2470; ECF No. 56-4, PageID.2474; ECF No. 59-7, PageID.3637–41).

Although FERC threatened to forbid Boyce Hydro from operating the dam and power plant, it would not have revoked Boyce's ownership. (*See* ECF No. 12-3, PageID.203–04). As a result, the threatened revocation would leave Boyce with a dam it could not collect revenue from. (*See id.*) Fearing that this would

disincentivize Boyce from upkeeping the dam and its accompanying lake, a group of lake associations, comprised of property owners on each lake created by the four dams, banded together to delay the revocation of Boyce's license. (ECF No. 56-2, PageID.2417, 2419–22). These associations later merged into a single organization known as the Four Lakes Task Force. (*Id.* at PageID.2417, 2421–22).

But the associations' efforts were not successful, and FERC revoked Boyce's license in September 2018. (ECF No. 59-7). Soon after, Midland and Gladwin Counties resolved to re-establish "historic" lake levels at each of the four lakes to "preserve and protect the value of property around the lakes." (ECF No. 56-3, PageID.2472; ECF No. 56-4, PageID.2475). The Counties named the Sanford Lake Preservation, a predecessor to the Four Lakes Task Force, as the "delegated authority" to "oversee the Lake Level Project . . . ." (ECF No. 56-3, PAgeID.2471; ECF No. 56-4, PageID.2475).

Midland and Gladwin Counties also filed a petition in the Midland County Circuit Court seeking an order that would establish and maintain the "normal" lake levels at each of the four lakes. (ECF No. 56-5). After obtaining input from state authorities, the court granted the Counties' petition. (*See* ECF No. 56-6).

But then, a year later, the Edenville Dam collapsed after several days of rain. (ECF No. 56-10, PageID.2565–66). The storm caused Wixom Lake, the reservoir created by the Edenville Dam, to rise three feet above its maximum historical level.

4

(*Id.* at PageID.2566). Yet the dam did not overtop; rather, the severe rainfall triggered a phenomena known as "static liquefaction"—a "sudden loss of soil strength"—which caused the collapse. (*Id.* at PageID.2564, 2567). The floodwaters released by this collapse travelled downstream before reaching, and overwhelming, the Sanford Dam in Midland County. (*Id.* at PageID.2564). The Sanford Dam failed and caused severe flooding and substantial property damage. (*See id.*)

According to Plaintiffs, the Counties' petition to set the lakes at historic levels is to blame for the collapse. (ECF No. 59, PageID.3016–17). They argue that the Counties knew, or should have known, that the lake levels they sought were "dangerously" high due to the dam's inadequate spillway capacity. (*Id.* at PageID.3023–24). Further, they point to an expert's opinion that the failure could have been avoided entirely had the lakes been set at a lower level, which would have created enough spillway capacity to avoid the elevated lake level that triggered the static liquefaction. (*Id.* at PageID.3025–26; *see also* ECF No. 59-1).

The Counties see it differently. They first note that the conditions that predisposed the dam to static liquefaction were a latent defect, dating back to the dam's construction in the 1920s. (ECF No. 56, PageID.2392). The concern raised by the dam's inadequate spillway capacity was not static liquefaction, but overtopping, which did not occur when the dam collapsed. (*Id.* at PageID.2406). And even if the Counties knew that the reservoir was predisposed to static

5

liquefaction, they argue that it was impossible to lower the lake levels enough to avoid it, regardless of where the circuit court set the levels. (*Id.* at PageID.5403; *see also* ECF No. 62, PageID.3911–12). Moreover, they argue that they could not have avoided the elevated water levels by increasing the dam's spillway capacity because they had no authority to construct the necessary infrastructure, and even if they did, that process would have taken several years to complete. (ECF No. 56, PageID.2404–05).

In June 2020, the Plaintiffs, a group of affected property owners, filed this putative class action against the Counties. (ECF No. 1). Their amended complaint alleges three claims against the Counties: (1) violation of the Fifth Amendment's Takings Clause under 42 U.S.C. § 1983; (2) violation of the Michigan Constitution's Takings Clause; and (3) gross negligence. (ECF No. 32, PageID.562–66.)

### C. Summary Judgment Standard

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that would affect "the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there . . . are any genuine factual issues that properly can be resolved only by a finder of fact . . . ."

6

*Id.* at 249–50, 255. Accordingly, "the evidence, all facts, and any inferences that may be drawn from the facts" must be viewed "in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004). The nonmoving party cannot rebut a Rule 56 motion by merely alleging that a genuine factual dispute exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting Fed. R. Civ. P. 56(e)). Instead, the nonmoving party must show that there is sufficient evidence in the record for "a reasonable finder of fact could find in its favor." *Anderson*, 477 U.S. at 248.

### D. Analysis

#### 1. Fifth Amendment Takings Clause

The Counties first move for summary judgment on Plaintiffs' Fifth Amendment Takings Clause claim. The Fifth Amendment provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend V. Takings Clause actions come in two varieties. *Meriden Trust & Safe Deposit Co. v. FDIC*, 62 F.3d 449, 454 (2d Cir. 1995); *Clear Channel Outdoor v. City of Lakewood*, No. 04-5427, 2005 WL 1354609, at *2 (W.D. Wash. June 3, 2005). Most often, the government takes property through direct eminent domain proceedings, under which the government institutes formal proceedings before taking an individual's private property. *Meriden Trust & Safe Deposit Co.*, 62 F.3d at 454. Sometimes, however, the government takes private property without first undergoing any formal proceedings. *See id.* In these situations, individuals must

seek just compensation by suing the government pursuant to some statute providing a private right of action. *See id.*

Where the government takes property without first bringing formal eminent domain proceedings, two kinds of takings can be at issue. First are "physical" or "per se" takings where the government permanently deprives an individual of all his or her property rights. *Waste Mgmt., Inc. of Tennessee v. Metro. Gov't of Nashville & Davidson County*, 130 F.3d 731, 737–38 (6th Cir. 1997). Second are constructive, or "regulatory," takings where the government does not confiscate private property outright but interferes with the owner's use of his or her property to such an extent that it effectively takes the property from its owner. *Id.* at 737. The Plaintiffs here allege a regulatory taking.[1] (*See* ECF No. 34, PageID.564–65).

But the injury Plaintiffs complain of is not a "taking" within the meaning of

---

[1] Although Plaintiffs label their Fifth Amendment Takings Clause claim as an "inverse condemnation" claim, the Counties dispute that the term "inverse condemnation" describes claims, like Plaintiffs', that are brought under 42 U.S.C. § 1983 rather than a state-law vehicle. (ECF No. 56, PageID.2397). The confusion is understandable, as federal courts have been inconsistent in their use of the term, sometimes using it to describe specific, state-created causes of action, and sometimes using it to broadly describe all actions brought by private entities to recover just compensation. *Compare Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2168 (2019), *and City of Montery v. Del Monte Dunes at Montery, Ltd.*, 526 U.S. 687, 724 (1999) (Scalia, J., concurring), *with United States v. Clarke*, 445 U.S. 253, 257 (1980), *Nazelrod v. Garett County Sanitary Dist., Inc.*, 241 F. Supp. 2d 532, 537 (D. Md. 2003), *and 287 Corp. Ctr. Assocs. v. Twp. of Bridgewater*, 101 F.3d 320, 322 (3d Cir. 1996). Yet that distinction does not matter here. All the Counties really dispute is the correct label for Plaintiffs' cause of action, as they concede that § 1983 allows inverse condemnation-style suits in federal court. (*See* ECF No. 56, PageID.2397–98); *see also Knick*, 139 S. Ct. 2162. Thus, the label used to describe Plaintiffs' claim has no bearing on its substance: inverse condemnation by any other name would smell as sweet. *See* William Shakespeare, Romeo and Juliet, act 2, sc. 2.

the Fifth Amendment. The Takings Clause does not apply to all instances where the government deprives individuals of their property: it applies only where the Government appropriates private property for the benefit of others. *Golf Vill. North, LLC v. City of Powell*, 14 F.4th 611, 618, 621 (6th Cir. 2021); *see Sanguinetti v. United States*, 264 U.S. 146, 149 (1924). Indeed, the Clause proscribes "takings" rather than "deprivations," "waste," or "destruction." That choice is significant. To take property is to "accept or receive" it, not merely to deprive another of its use, *Take*, The New Oxford American Dictionary (3d ed. 2010), and the word meant nothing different at the time of ratification.[2]

Further, the Clause does not simply proscribe uncompensated "takings," but uncompensated "takings for public use." U.S. Const. amend V. That language "presupposes that the government has acted in pursuit of a valid government purpose." *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 543 (2005). Indeed, the Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960); *see also Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002). Thus, takings for the benefit of private entities, let alone deprivations of

---

[2] *See, e.g.*, *Take*, The New and Complete Dictionary of the English Language (2d ed. 1795); *Take*, A Dictionary of the English Language (6th ed. 1785); *Take*, An Universal Etymological English Dictionary (22d ed. 1770).

9

property for the benefit of no one, are not the sort of injury contemplated by the Takings Clause.³ The Clause does not apply to situations where the government damages private property without appropriating it for the benefit of another. *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355–56 (Fed. Cir. 2003).

Accordingly, the deprivation of private property rights only constitutes a regulatory taking if the government impaired those rights for the benefit of others. Take two early flooding cases for example. In *Pumpelly v. Green Bay Co.*, the State of Wisconsin authorized a company to build a dam for the benefit of the public. 80 U.S. (13 Wall.) 166, 176 (1871). But as a natural consequence of constructing a dam, the company formed a lake which flooded the plaintiff's land. *Id.* at 177. The Court rejected the company's argument that the flooding was not a taking because it was a mere "consequential result" of the dam's construction. *Id.* at 177–80. Although the Court conceded that there may be situations where damage to an

---

³ True, Courts have long recognized that the government may not take private property for private use. In other words, the government may not take property from one individual just to redistribute it to another person, rather than the public. But this rule does not derive from the "public use" language of the Takings Clause. Eduardo M. Peñalver & Lior Jacob Strahilevitz, *Judicial Takings or Due Process?*, 92 Cornell L. Rev. 305, 327 & n.85 (2012) (first citing *Pennsylvania Coal v. Mahon*, 260 U.S. 393, 415 (1922); and then citing *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 543 (2005)); *see also* Jeb Rubenfeld, *Usings*, 102 Yale L.J. 1077, 1120 & n.200 (1993). Rather, it is the Due Process Clause of the Fifth Amendment that proscribes private takings. Peñalver & Strahilevitz, *supra*, at 327; *see Fallbrook Irrigation Dist. v. Bradley*, 164 U.S. 112, 158 (1896). After all, the Takings Clause protects property from being "taken for public use without just compensation," not from being "taken *except* for public use *and* not without just compensation." Rubenfeld, *supra*, at 1119 (internal quotation marks omitted). Private takings, even if they were not prohibited by the Due Process Clause, do not implicate the Takings Clause. *Id.* at 1113–14, 1119–30.

individual's property may be too "remote and consequential" to constitute a taking, it held that the flooding caused by the dam was not so attenuated from the dam's construction that it was not a taking. *Id.* at 180. Indeed, building a dam necessarily entailed flooding a large swath of land that included the plaintiff's property.[4] *See id.*

By contrast, consider *Sanguinetti v. United States*. There, the government constructed a canal, intending for the project to reduce flooding in the surrounding area. But soon after the canal's construction, a "flood of unprecedented severity" caused the canal to overflow onto the plaintiff's land. 264 U.S. at 147. The Court held that this was not a taking. *Id.* at 149–50. While the Court expressed doubts that the canal caused the flooding of the plaintiff's land, it found it just as important that the flooding of the plaintiff's land was not inherently intertwined with the project itself. *Id.* Unlike *Pumpelly*, the government neither intended to flood the land nor had "any reason to expect that such [a] result would follow." *Id.* In other words, it did not "appropriate" the plaintiff's land by flooding it to advance a public project. *Id.*

Since these early cases, lower courts have continued to recognize that only deprivations of property for the benefit of others fall within the ambit of the Takings

---

[4] Although *Pumpelly* dealt with the Wisconsin constitution's takings clause, the Court found no meaningful distinction between Wisconsin's takings clause and its federal counterpart. *Id.* at 176–77; *see also Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 32 (2012) (citing *Pumpelly* as persuasive authority when interpreting the federal Takings Clause).

11

Clause—often making explicit what was only implicit in *Pumpelly* and *Sanguinetti*. *E.g.*, *Ridge Line, Inc.*, 346 F.3d at 1355–56; *Miller v. United States*, 583 F.2d 857, 863 & n.18 (6th Cir. 1978), *overruled on other grounds by Arkansas Game & Fish Comm'n*, 568 U.S. at 38–39; *Williams v. City of Detroit*, No. 06-CV-12809, 2008 WL 4239220, at *16, *20 (E.D. Mich. Sept. 11, 2008); *Columbia Basin Orchard v. United States*, 132 F. Supp. 707, 710 (Ct. Cl. 1955). And the Sixth Circuit is no exception. Indeed, the Court recently explained that "to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner." *Golf Vill. North, LLC*, 14 F.4th at 621. So because the government must intend to deprive property to benefit others, there is no such thing as an 'accidental taking': a taking can only occur where the damage to private property is the "direct, natural, or probable result of an authorized activity." *Id.* at 620–21; *see also Thune v. United States*, 41 Fed. Cl. 49, 52 (1998). A deprivation of private property that is "incidental" to the government's action, or that is foreseeable but not intended to confer any use to another entity, is not a "taking" under the Fifth Amendment.[5] *Golf Vill. North, LLC*, 14 F.4th at 620–21.

Yet here, the Plaintiffs present no evidence that the Counties appropriated

---

[5] *Golf Village* recites language from *Ridge Line*, 346 F.3d at 1355, explaining that only permanent, rather than temporary, deprivations can constitute takings. 14 F.4th at 620–21. However, the Supreme Court rejected this rule in *Arkansas Game and Fish Comm'n*, 568 U.S. at 38–39, and the Sixth Circuit did not rely on it to reach its holding in *Golf Village*. *See* 14 F.4th at 620–21.

12

their properties for the benefit of the public.  The Plaintiffs argue that the Counties "took" their property by setting "dangerously" high lake levels to "protect the value of property around the lake" despite knowing that those lake levels would increase the risk of a dam failure.  (ECF No. 59, PageID.3023–27, 3030–31; *see also* ECF No. 32, PageID.562–64, ¶¶ 96–104).  But even if the record contains evidence to support that theory—a point the Counties dispute—the conduct Plaintiffs describe is not a taking under the Fifth Amendment.  No matter how foreseeable the dam failure may have been, the Counties did not flood Plaintiffs' properties *to* achieve any public benefit.  *See Golf Vill. North, LLC*, 14 F.4th at 620–21.  Quite the opposite, the Counties set the lake levels to "protect" Plaintiffs' property value.  (ECF No. 59-2, PageID.3117, 3124; *accord* ECF No. 59, PageID.3023–24).  Flooding Plaintiffs' land could not have been part of this goal.  Put differently, there is no genuine dispute that the Counties flooded Plaintiffs' lands as a necessary trade-off to achieve some public benefit, as was true in *Pumpelly*.  *Cf.* 80 U.S. at 177–80.  While the Counties may have increased the *risk* of flooding to achieve some public benefit, they did not take property from the Plaintiffs for the *use* of others.

At bottom, the Counties did not "take" the Plaintiffs' properties because they did not flood their properties "to appropriate a benefit" for any third party.  *Golf Vill. North, LLC*, 14 F.4th at 621.  Accordingly, I recommend that the Court grant summary judgment in favor of the Counties on Plaintiffs' Fifth Amendment claim.

    **2.**    **Michigan's Takings Clause**

For similar reasons, the Court should also grant summary judgment in favor of the Counties on Plaintiffs' inverse condemnation claim under the Michigan Constitution. Michigan's Constitution forbids the government from taking private property "for public use without just compensation. . . ." Mich. Const. of 1963 art. X, § 2. Like its federal counterpart, Michigan's Takings Clause contemplates a specific type of harm to private property—appropriations of private property for the "use" of another. *See id.*[6] Indeed, Michigan courts recognize that a taking, by definition, occurs when private property "has been damaged by a public improvement undertaking or other public activity." *Allen v. City of Laingsburg*, No. 286031, 2010 WL 539823, at \*2 (Mich. Ct. App. 2010) (citing *Merkur Steel Supply Inc. v. Detroit*, 680 N.W.2d 485, 494 (2004)); *see also In re Acquisition of Virginia Park*, 328 N.W.2d 602, 604 (1982).

Michigan law, therefore, distinguishes between "takings" which occur only where private property is damaged in pursuit of a public project, and ordinary torts, where a public project damages private property by accident. *See Allen*, 2010 WL 539823, at \*2; *Franklin v. Flint Twp. Sewer & Water Dept.*, No. 253784, 2005 WL 1364396, at \*3 (Mich. Ct. App. 2005). For an example of a taking in pursuit of a public project, consider *Peterman v. State Dep't of Nat. Resources*, 521 N.W.2d 499

---

[6] Unlike the Fifth Amendment's Takings Clause, Michigan's Takings Clause contains language suggesting that it might prohibit private takings. *See id.* ("'Public use' does not include the taking of private property for transfer to a private entity . . . ."). Still, Michigan's Takings Clause, like the Fifth Amendment, only discusses takings for the "use" of others.

(Mich. 1994). In *Peterman*, the DNR constructed a public boat launch, knowing that the launch would erode a private beach just thirty feet away. *Id.* at 507. The Court held that the state "took" the private beach because it effectively eroded the beach to construct its boat launch.

On the tort side of the fence is *Faulknor v. Dalton Township*, No. 284340, 2009 WL 1440758 (Mich. Ct. App. 2009). There, owners of a tavern brought an inverse condemnation claim against their township alleging that the township damaged their property while boring a path to install a sewer line below the street in front of the tavern. *Id.* at *1. According to the owners, the boring caused severe vibrations which irreparably damaged the foundation, walls, and ceiling of the tavern. *Id.* But the Court of Appeals held that the Township did not "take" the tavern from its owners, reasoning that the Township did not intend to damage the tavern as part of its plans to install a sewer line. *Id.* at *2–3. Rather, the township, at most, negligently damaged the tavern, and as such any cause of action against the township would sound in tort rather than inverse condemnation. *Id.* (citing *Thune*, 41 Fed. Cl. At 52); *see also Hinojosa v. Dep't of Nat. Resources*, 688 N.W.2d 550, 556–57 (Mich. Ct. App. 2004); *Attorney General v. Ankersen*, 385 N.W.2d 658, 674–75 (Mich. Ct. App. 1986).

Like their Fifth Amendment claim, Plaintiffs' state law inverse condemnation claim fails because they have presented no evidence from which a reasonable factfinder could infer that the Counties flooded their properties to achieve some

15

public benefit. At most, the Counties actions constitute a tort, not a taking. *Cf. Faulknor*, 2009 WL 1440758, at *2–3. And for that reason, I recommend that the Court also grant summary judgment in favor of the Counties on Plaintiffs' state-law inverse-condemnation claim.

### 3. Gross Negligence

That leaves Plaintiffs' gross negligence claim. Defendants argue that they are entitled to governmental immunity. (ECF No. 56, PageID.2406-07.) Under Michigan law, governmental agencies engaged in either mandated or authorized governmental functions, are immune from liability. Mich. Comp. Laws § 691.1407(1). The alleged action by the Counties to petition the court to set the lake levels at a normal lake level was certainly an authorized function and Plaintiffs do not argue otherwise. Rather, Plaintiffs rely exclusively on the exception to governmental immunity that excludes an employee who has committed gross negligence. Mich. Comp. Laws § 1407(2).

"Although subsection (2)(c) establishes an exception to the grant of immunity to an officer or employee of a governmental agency, it does not provide that a governmental agency otherwise entitled to immunity can be vicariously liable for the officer's or employee's gross negligence." *Yoches v. Dearborn*, 904 N.W.2d 887, 895–96 (Mich. Ct. App. 2017); *see also Ostrowski v. Charter Twp. of Canton*, No. 331949, 2017 WL 3197688, at *1 & n.3 (Mich. Ct. App. 2017); *Ross v. Consumer's Power*, 363 N.W.2d 641, 661–64 (Mich. 1984). Yet here, Plaintiffs did not sue any individual

employees of the Counties but rather have sued the Counties themselves. Because the gross negligence exception applies only to individuals and not governmental agencies, the Counties are entitled to judgment as a matter of law. *Hoxie v. Livingston Co.*, 2009 WL 2033055, at *5 (E.D. Mich. July 9, 2009); *Vine v. County of Ingham*, 884 F. Supp. 1153, 1161 (W.D. Mich. 1995).[7]

### E. Conclusion

For these reasons, **I RECOMMEND** that this Court **GRANT** Defendants' motion for summary judgment (ECF No. 56) and dismiss the amended complaint (ECF No. 32).

## III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days

---

[7] Tucked away in a one-sentence footnote at the end of their response brief, Plaintiffs move for leave to amend their complaint to "assert gross negligence against the individual employees who petitioned" for the "dangerously high lake levels" should this Court "find that" their "gross negligence claims" cannot be asserted against the Counties. (ECF No. 59, PageID.3033). The Counties respond that the Court cannot grant this relief because Plaintiffs did not file a "motion." But on that point, I disagree. A motion is nothing more than "a request for a court to enter an order." *Doe I v. Exxon Mobil Corp.*, No. 1:01-cv-1357, 2021 WL 1910892, at *4 (D.D.C. May 12, 2021). While motions often are (and almost always should be) filed separately from each other and accompanied by a brief, these are not defining characteristics of a "motion." *See id.* In any event, the Court has only referred the Counties' motion for summary judgment to me for a report and recommendation, so I will not opine on the merits of Plaintiffs' motion to amend.

after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: July 10, 2023　　　　　　　　　　　　s/ PATRICIA T. MORRIS
　　　　　　　　　　　　　　　　　　　　　Patricia T. Morris
　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge